# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 20, 2014        Decided April 3, 2015

No. 13-7109

MANOUCHEHR MOHAMMADI, ET AL.,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01289)

*Larry Klayman* argued the cause and filed the brief for appellant.

Before: KAVANAUGH and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: Plaintiffs, three Iranian émigré siblings and the estate of their deceased brother, seek recovery for imprisonment, torture, and extrajudicial killing they allegedly suffered at the hands of the Islamic Republic of Iran. The district court dismissed the complaint, finding that it lacked subject-matter jurisdiction, principally because of

defendants' foreign sovereign immunity. The court also denied plaintiffs' motion for reconsideration and their associated motion for leave to file a fourth amended complaint. We affirm the district court.

I.

As college students in Tehran during the 1990s, plaintiff Manouchehr Mohammadi and his late brother, Akbar Mohammadi, became leaders in the Iranian pro-democracy movement. As part of their political activism, the brothers participated in the 1999 student protests.

Iranian officials arrested the brothers for their role in the protests and confined them in Evin prison in Tehran, where they allegedly suffered brutal physical and psychological abuse and torture. According to plaintiffs' testimony, the brothers were repeatedly flogged, hung from the ceiling by their hands, beaten to the point of unconsciousness, burned on their genitalia, exposed to the elements, and subjected to mock executions.

Akbar's and Manouchehr's sisters, Nasrin Mohammadi and Simin Taylor, also allegedly suffered severe mistreatment at the hands of the Iranian regime. Nasrin testified that an Iranian agent attempted to murder her in Germany in 2002, and Simin claims to have been imprisoned and threatened with rape while living in Iran.

Akbar died in prison in 2006. Manouchehr fled Iran while on temporary release from prison to attend Akbar's funeral. By late 2006, the three surviving siblings all had settled in the United States. Nasrin and Simin ultimately obtained United States citizenship, and Manouchehr became a lawful permanent resident. Plaintiffs contend that Iranian

agents continued to harass them in the United States, threatening them over the phone with murder, refusing to let their parents leave Iran, hacking their computers, and circulating doctored photographs of Nasrin depicted in an immodest light.

In 2009, plaintiffs brought an action to recover for their injuries. They named as defendants the Islamic Republic of Iran, the Army of the Guardians of the Islamic Revolution (the Revolutionary Guard), and two Iranian leaders, Ayatollah Sayid Ali Hoseyni Khamenei and Mahmoud Ahmadinejad. Plaintiffs amended their complaint on three occasions.

Because defendants never appeared in court to contest the allegations against them, plaintiffs filed a motion for entry of default and a default judgment. The district court granted the motion for entry of default and scheduled an evidentiary hearing to establish damages. The court also directed plaintiffs to submit briefing addressing the basis for the court's subject-matter jurisdiction.

Following several rounds of supplemental briefing, the district court dismissed plaintiffs' complaint for lack of subject-matter jurisdiction. *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48 (D.D.C. 2013). The court held that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*, afforded Iran and the Revolutionary Guard immunity from the court's jurisdiction. *Mohammadi*, 947 F. Supp. 2d at 62-68. The court rejected plaintiffs' reliance on the Foreign Sovereign Immunity Act's terrorism exception, 28 U.S.C. § 1605A. *Id.* That exception abrogates immunity if, among other things, the complaint seeks damages for "torture" or "extrajudicial killing" and the victim was a "national of the United States" at the time of those acts. 28 U.S.C. § 1605A(a). The district court held that plaintiffs

failed to qualify as United States "nationals" at the time of the relevant acts in Iran, and that any acts postdating plaintiffs' relocation to the United States failed to constitute "torture" within the meaning of the statute. *Mohammadi*, 947 F. Supp. 2d at 68. With regard to the individual defendants, Khamenei and Ahmadinejad, the court held that the claims against them would be treated as claims against Iran itself and thus would likewise be dismissed based on foreign sovereign immunity. *Id.* at 72-73. Because the court concluded that it lacked subject-matter jurisdiction, it also denied plaintiffs' motion for default judgment.

Plaintiffs filed a motion for reconsideration and an accompanying motion for leave to file a fourth amended complaint. The district court denied both motions. *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 74 (D.D.C. 2013), *recons. denied* (D.D.C. Jul. 12, 2013). Plaintiffs now appeal the dismissal of their third amended complaint for lack of subject-matter jurisdiction and the denial of their motions for reconsideration and for leave to file a fourth amended complaint.

## II.

The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.*, affords the "sole basis for obtaining jurisdiction over a foreign state" in United States courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). While the FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts, 28 U.S.C. § 1604, that grant of immunity is subject to a number of exceptions, *see id.* §§ 1605-1607. In their third amended complaint, plaintiffs asserted subject-matter jurisdiction based solely on the FSIA's terrorism exception, 28 U.S.C. § 1605A. Reviewing

the matter de novo, *see National Air Traffic Controllers Ass'n v. Federal Service Impasses Panel*, 606 F.3d 780, 786 (D.C. Cir. 2010), we agree with the district court's conclusion that the terrorism exception is inapplicable here.

The terrorism exception abrogates immunity in cases in which a plaintiff seeks damages for personal injury or death caused by "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act," if "engaged in by an official, employee, or agent" of a foreign country.  28 U.S.C. § 1605A(a)(1).  The exception further requires that (i) the foreign country was designated a "state sponsor of terrorism at the time [of] the act," (ii) the "claimant or the victim was" a "national of the United States" at that time, and (iii) the "claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  *Id.* § 1605A(a)(2).

Because Iran has been designated a state sponsor of terrorism since 1984, plaintiffs satisfy the first of those conditions.  *See Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 937 (D.C. Cir. 2013); *Roeder v. Islamic Republic of Iran*, 646 F.3d 56, 58 n.1 (D.C. Cir. 2011).  Plaintiffs, however, fail to satisfy the second condition with regard to the torture and extrajudicial killing allegedly committed against them while in Iran, because none of them was a "national of the United States" at the time of those acts.

The terrorism exception assigns the term "national of the United States" the "meaning given that term in section 101(a)(22) of the Immigration and Nationality Act" (INA), 8 U.S.C. § 1101(a)(22).  28 U.S.C. § 1605A(h)(5).  The referenced provision of the INA, in turn, generally describes "national of the United States" to mean either a "citizen of the United States" or a "person who, though not a citizen of the

United States, owes permanent allegiance to the United States."  8 U.S.C. § 1101(a)(22).

Here, it is undisputed that none of the plaintiffs was a United States citizen between 1999 and 2006, when the central alleged acts of torture and extrajudicial killing occurred in Iran.  Instead, plaintiffs argue that they qualified as United States nationals during that time because they "owe[d] permanent allegiance to the United States."  They assert that Manouchehr, Akbar, and Nasrin had personally pledged permanent allegiance to the United States and disclaimed their loyalty to Iran following the "first signs of persecution" in Iran, and that Nasrin exhibited her allegiance by applying for and attaining United States permanent resident status before Akbar's death in 2006.  *Mohammadi*, 947 F. Supp. 2d at 64.

Plaintiffs' argument is foreclosed by our precedent.  We have held that "manifestations of 'permanent allegiance' do not, by themselves, render a person a U.S. national."  *Lin v. United States*, 561 F.3d 502, 508 (D.C. Cir. 2009).  That is because the "phrase 'owes permanent allegiance'" in 8 U.S.C. § 1101(a)(22) is "a term of art that denotes a legal status for which individuals have never been able to qualify by demonstrating permanent allegiance, as that phrase is colloquially understood."  *Marquez-Almanzar v. INS*, 418 F.3d 210, 218 (2d Cir. 2005); *see Lin*, 561 F.3d at 508 (relying on *Marquez-Almanzar*).  The reference in 8 U.S.C. § 1101(a)(22) to a United States national as a person who "owes permanent allegiance to the United States" is descriptive of someone who has attained the status of United States nationality through other statutory provisions; it does not itself set forth an independent basis by which to obtain that status.  The language, that is, "describes, rather than confers, U.S. nationality."  *Marquez-Almanzar*, 418 F.3d at

218; *see Lin*, 561 F.3d at 508. The conferral of United States nationality must come from elsewhere.

The sole such statutory provision that presently confers United States nationality upon non-citizens is 8 U.S.C. § 1408. *See Lin*, 561 F.3d at 508; *Marquez-Almanzar*, 418 F.3d at 219. Plaintiffs make no claim that they qualify as United States nationals under that provision, much less that they did so at the time of the alleged torture and extrajudicial killing in Iran. Section 1408 describes four categories of persons who "shall be nationals, but not citizens, of the United States at birth." 8 U.S.C. § 1408. Those categories generally consist of persons born in, or possessing a specified personal or parental connection with, an "outlying possession of the United States," *id.* § 1408(1)-(4), presently defined as American Samoa and Swains Island, *id.* § 1101(a)(29). *See Lin*, 561 F.3d at 508; *see also Hashmi v. Mukasey*, 533 F.3d 700, 703 n.1 (8th Cir. 2008) (noting that the category of those who owe "permanent allegiance to the United States . . . [is] apparently limited to residents of American Samoa and Swains Island").

The courts of appeals to consider the issue thus have overwhelmingly concluded that the status of non-citizen United States nationality is limited to those persons described in 8 U.S.C. § 1408, and that, apart from that provision, an effort to demonstrate "permanent allegiance to the United States" does not render a person a United States national. *See United States v. Sierra-Ledesma*, 645 F.3d 1213, 1224-26 (10th Cir. 2011); *Abou-Haidar v. Gonzales*, 437 F.3d 206, 207 (1st Cir. 2006); *Omolo v. Gonzales*, 452 F.3d 404, 409 (5th Cir. 2006); *Sebastian-Soler v. U.S. Att'y Gen.*, 409 F.3d 1280, 1285-87 (11th Cir. 2005); *Marquez-Almanzar*, 418 F.3d at 218-19; *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 972 (9th Cir. 2003); *Salim v. Ashcroft*, 350 F.3d 307, 309-10 (3d

Cir. 2003) (per curiam). While one court of appeals has indicated otherwise, *see United States v. Morin*, 80 F.3d 124, 126 (4th Cir. 1996), we specifically "join[ed] the majority" approach in *Lin*, 561 F.3d at 508. (And the continuing practical force of the Fourth Circuit's decision in *Morin* within that circuit appears unclear. *See Fernandez v. Keisler*, 502 F.3d 337, 348 (4th Cir. 2007).) Plaintiffs likewise err in relying on certain district court decisions attributing United States nationality to non-citizens based on unique circumstances indicating a "permanent allegiance to the United States." *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 39 n.4 (D.D.C. 2007); *Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24, 26 (D.D.C. 2003). Those decisions predate ours in *Lin*.

After *Lin*, in short, plaintiffs' professed "attitudes of permanent allegiance do not help" them establish United States nationality. 561 F.3d at 508. Plaintiffs thus fail to satisfy the terrorism exception's nationality requirement for the 1999-2006 time period, when the central alleged acts of torture and extrajudicial killing took place in Iran.

Since 2006, however, two of the plaintiffs have unquestionably become "nationals" within the meaning of 8 U.S.C. § 1101(a)(22): Nasrin and Simin obtained United States citizenship in 2009 and 2011, respectively. Plaintiffs therefore contend that they can establish jurisdiction under the terrorism exception with respect to events occurring after Nasrin and Simin became United States citizens. That argument could have merit, however, only if, after Nasrin became a citizen in 2009, the Iranian regime engaged in conduct against plaintiffs constituting "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." *See* 28 U.S.C. § 1605A(a)(1), (a)(2). According to plaintiffs, the Iranian

regime continued to "torture" them in the United States by making threatening phone calls, hacking certain of plaintiffs' online accounts, and disseminating doctored, sexually explicit photographs of Nasrin. We conclude that those alleged acts, while certainly harassing and objectionable, fail to amount to "torture" within the meaning of the terrorism exception.

The terrorism exception defines "torture" by reference to the definition of that term contained in the Torture Victim Protection Act (TVPA), 106 Stat. 73, note following 28 U.S.C. § 1350. *See* 28 U.S.C. § 1605A(h)(7). The TVPA, in turn, defines torture as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . is intentionally inflicted on that individual." 28 U.S.C. § 1350 (note). It is doubtful that plaintiffs could be considered to have been in the Iranian regime's "custody or physical control" after their relocation to the United States.

Even assuming otherwise, the challenged acts postdating plaintiffs' settlement in the United States fail to satisfy the statute's severity requirement. Plaintiffs' allegations did not involve physical acts against them. And the non-physical acts alleged—*viz.*, threatening phone calls made from Iran, hacking of Facebook and email accounts, and circulation of explicit photographs—fall short of anything previously held to constitute "torture" within the meaning of the TVPA. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003).

In addition to claiming that they have been subjected to continuing torture after their settlement in the United States, plaintiffs argue that Iran has engaged in "hostage taking" within the meaning of the FSIA's terrorism exception because the Iranian regime refuses to permit their parents to leave

Iran. The district court found that argument to have been waived on the ground that plaintiffs failed to press it until their post-judgment motion for reconsideration. We find no abuse of discretion in that ruling. *See GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012).

In any event, a prohibition on international travel of the kind alleged by plaintiffs would not constitute "hostage taking." The statute's definition of "hostage taking" incorporates the definition from Article 1 of the International Convention Against the Taking of Hostages, *see* 28 U.S.C. § 1605A(h)(2), and that definition applies to a person who "seizes or detains and threatens to kill, to injure or to continue to detain another person," *Simpson*, 326 F.3d at 234 (internal quotation marks omitted). Even if plaintiffs' parents are barred from traveling abroad from Iran, there is no allegation that they have been "seized or detained" within Iran under any ordinary understanding of those terms. Courts thus have found "hostage taking" in cases involving physical capture and confinement, not restrictions on international travel. *See, e.g.*, *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 358 (D.C. Cir. 2006); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 109-111, 113 (D.D.C. 2000).

Because plaintiffs fail to satisfy the statutory requirements of the terrorism exception, Iran, as a "foreign state," is "immune from the jurisdiction" of federal courts. *See* 28 U.S.C. § 1604. The district court concluded that it also lacked jurisdiction over the Revolutionary Guard because the FSIA defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state," *id.* § 1603(a). Plaintiffs have forfeited any challenge to that conclusion by failing to contest it on appeal. *See, e.g.*, *World Wide Minerals, Ltd. v. Republic of*

*Kazakhstan*, 296 F.3d 1154, 1160 (D.C. Cir. 2002). Plaintiffs also raise no challenge to the district court's determination that foreign sovereign immunity extended to the individual defendants, Khamenei and Ahmadinejad. Immunity under the FSIA therefore applies to all defendants.

In a final effort to establish subject-matter jurisdiction, plaintiffs invoke the Alien Tort Statute, 28 U.S.C. § 1350. The Alien Tort Statute, however, does not confer any waiver of foreign sovereign immunity. *See Amerada Hess*, 488 U.S. at 438-39; *Enahoro v. Abubakar*, 408 F.3d 877, 883 (7th Cir. 2005); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 713 n.13 (9th Cir. 1992). The Alien Tort Statute affords jurisdiction for suits against private defendants, not against foreign sovereigns. The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state." *Amerada Hess*, 488 U.S. at 439. We therefore affirm the district court's dismissal of plaintiffs' third amended complaint for lack of subject-matter jurisdiction.

III.

After the district court granted dismissal, plaintiffs filed motions for reconsideration and for leave to file a fourth amended complaint. The only basis for jurisdiction under the FSIA asserted in the third amended complaint was the terrorism exception, 28 U.S.C. § 1605A. In the proposed fourth amended complaint, plaintiffs sought to invoke 28 U.S.C. § 1605(a)(5), the FSIA's noncommercial torts exception, as an additional basis for jurisdiction. The district court denied plaintiffs' motion for reconsideration and consequently denied as moot plaintiffs' motion to file a fourth amended complaint. *Mohammadi*, 947 F. Supp. 2d at 84. We review the district court's ruling for abuse of discretion, *see GSS Group Ltd.*, 680 F.3d at 811; *In re InterBank Funding*

*Corp. Securities Litigation*, 629 F.3d 213, 218 (D.C. Cir. 2010), and we perceive no basis for overturning it.

Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be "freely give[n]" when "justice so requires." But after entry of judgment, a court has no obligation to grant leave to amend unless a plaintiff first satisfies "Rule 59(e)'s more stringent standard for setting aside that judgment." *Ciralsky v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004) (internal quotation marks omitted). "[R]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." 11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1 (3d ed. 2012). A district court need not grant a Rule 59(e) motion unless there is an "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012) (internal quotation marks omitted).

Plaintiffs do not allege any change in applicable law, new evidence, or clear error. Rather, they contend that the district court's failure to consider the fourth amended complaint constituted a "manifest injustice" because they had included the noncommercial torts exception as a jurisdictional basis in the initial complaint and first two amended complaints, but omitted it—allegedly inadvertently—from the third amended complaint.

"[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint," however, "courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007). The district court thus had no obligation to consider jurisdictional bases set forth in prior iterations of the

complaint. Moreover, plaintiffs made no reference to the noncommercial torts exception at the evidentiary hearing or in their supplemental briefing addressing jurisdiction. In those circumstances, the district court acted comfortably within its discretion in relying on the sole jurisdictional basis set forth in the third amended complaint and associated supplemental briefing. There could be no "manifest injustice" where, as here, plaintiffs could have "easily avoided the outcome" but either failed to "exercise[] due diligence," *Fox v. American Airlines, Inc.*, 389 F.3d 1291, 1296 (D.C. Cir. 2004), or "elected not to act" until after the entry of judgment, *Ciralsky*, 355 F.3d at 673.

Having concluded that the district court did not abuse its discretion in denying plaintiffs' motion for reconsideration under Rule 59(e), we likewise find that the court did not err in denying plaintiffs' Rule 15(a) motion for leave to file a fourth amended complaint. "Since the court declined to set aside the judgment under Rule 59(e), it properly concluded that [plaintiffs'] motion to amend under Rule 15(a) was moot." *Ciralsky*, 355 F.3d at 673.

\* \* \* \* \*

We affirm the district court's dismissal for lack of subject-matter jurisdiction and its denial of plaintiffs' motions for reconsideration and for leave to file a fourth amended complaint.

*So ordered.*